No. 12734

IN THE SUPREME COURT OF THE STATE OF MONTANA

1974

RICHARD E. LYNCH,

Plaintiff and Appellant,

-vs-

J. PAUL SHIELDS and JESSIE I. SHIELDS,
husband and wife,

Defendants and Respondents.

Appeal from: District Court of the Sixth Judicial District,
Honorable Jack D. Shanstrom, Judge presiding.

Counsel of Record:

For Appellant:

Berg, Angel, Andriolo and Morgan, Bozeman, Montana
Richard J. Andriolo argued, Bozeman, Montana

For Respondents:

Landoe, Gary and Donald E. White, Bozeman, Montana
H. B. Landoe argued, Bozeman, Montana

Submitted: November 20, 1974

Decided: DEC - 3 1974

Filed:

Thomas J. Kearney
Clerk

Mr. Justice Wesley Castles delivered the Opinion of the Court.

Plaintiff appeals from a judgment for defendants entered on findings of fact and conclusions of law after denial of a motion to alter and amend those findings and conclusions. The case was tried to the court in the sixth judicial district, county of Park, the Hon. Jack D. Shanstrom, presiding without a jury.

Plaintiff, Richard E. Lynch, brought the action to recover the sum of $10,000 which he had paid to defendants J. Paul Shields and Jessie I. Shields, husband and wife, allegedly as a good faith deposit in connection with negotiations to purchase the OTO ranch in Park County. Defendants answered denying the payment was simply a good faith deposit, but rather that it was payment for an option to purchase.

The issues on appeal are:

1. The district court erred in refusing to find that an alleged oral contract or option agreement was not enforceable by way of defense as it violated the statute of fraud.

2. The court erred in finding a legally binding contract existed between the parties.

To answer the issues, the facts are important.

One Bud Bellis, who had hunted on the Shields' property, called Paul and Jessie Shields in March 1970 saying that he had a group of people interested in buying their ranch and asking them to wait before selling it. On April 23, 1970, plaintiff Lynch and Bellis flew to Montana for the purpose of viewing the ranch. Mr. Lynch described himself as a "stockbroker part time, a securities salesman". Prior to his present position he worked as a merger consultant assisting in the sale of corporations, and before that as a securities salesman.

The Shields were willing to sell the entire ranch for

- 2 -

$500,000, but at this first meeting they reached an agreement whereby they would retain a controlling interest in the ranch by selling 49% of the OTO Corporation, which would have to be expanded. The total price agreed upon was $245,000 for 49% interest, 29% of which was to be paid on delivery of the stock, with $10,000 of that 29% figure to be paid on execution of an instrument. The remainder was to be paid in equal yearly installments. They discussed the transaction day and night for three days, agreeing on what Paul Shields considered to be all the aspects of the deal, and the details were never changed. Jessie Shields testified this was the agreement reached and so did Lynch, who left Montana with the intention of consummating the deal if investors could be found. The Shields had given him time to obtain investors.

Shortly after returning to Arizona, the interested men received the proposed "Agreement to Sell and Buy Capital Stock" and "Transactions Involved in Sale of Capital Stock of OTO Ranch" which Lynch expected and which Lynch and Bellis had requested so that the sale could be consummated. The interest figure, for which a blank was left, was testified to by Paul and Jessie Shields to have been decided on as 7%. The documents set out the terms as agreed upon and the Shields believed that they were entirely satisfactory to the men because the Shields did not hear from them.

On May 11, 1970, Jessie Shields wrote a letter to Bellis and Lynch in which she stated, because she had not heard from them in a long time, she supposed they were no longer interested. This letter prompted a call from Lynch followed by another visit so that the ranch could be shown to a prospective investor and on May 15 Lynch brought a doctor to look over the ranch. When the doctor left after spending only a short time on the ranch,

- 3 -

Lynch stayed for two days talking over his plans with the Shields as if the agreement was soon to be signed.

At this time Paul told Lynch that since so many people were interested in the ranch, Lynch would have to put up $10,000 for an option. Concerned about the possibility that enough investors could not be found, Paul did not want Lynch to have to forfeit the consideration for an option. He asked Lynch if he could raise the downpayment on his own because, as Lynch testified Paul told him: "He said, well, if the rest of your syndicate doesn't get together then the only way you can get that $10,000.00 back is if you put up the whole downpayment." Paul Shields testified: "And I asked him, I said, well, Dick, to make this a deal you will have to put up an option of $10,000.00 to know that we have got something. We want to sell this deal and we can't set here all summer and lose the people who were wanting to buy all of the time at that time." Jessie's testimony agreed with Paul's, and the parties agreed that on payment of the $10,000 the option would run until August 1, 1970.

Lynch testified that when he returned to Phoenix he "got nervous" and sent a check for $10,000 to the Shields. He thought that this would give him the first chance to buy. He thought he had accomplished something by sending the check and the Shields would hold the deal for him. In the letter accompanying his check he wrote:

> "This is only the first step in what should be
> a long and friendly business relationship. We
> are all looking forward to being stockholders
> in OTO Ranch * * * We will forward the agreement
> once we have legally established our (Bud's and
> mine) power of attorney to sign for the group.
> I hope our check is sufficient for now."

It seemed as though the signed Agreement was forthcoming.

The Shields refrained from showing the valuable ranch, and although many people inquired about its possible purchase,

- 4 -

they were told that it was not for sale.  In a letter of May 29, 1970, Jessie Shields assured the two men that they were properly managing the ranch and wanted to keep them informed of what was happening.  She asked if their wives could come up to give her ideas on fixing up the houses, which she was readying for them.  On June 26, 1970, she again wrote and expressed concern for the management of the ranch in the future; since the Agreement would give the investors a 49% interest, there was much planning and trust which would be needed.  In one part she wrote:  "Gretchen left the house up on the OTO property just in perfect shape.  We could rent it but didn't think we had better till we found out what you boys wanted to do."  She ended by reminding Bud Bellis that he still had to pick out the house he wanted.

On July 31 or August 1, 1970, Richard Lynch called the Shields because the ninety days which the Shields had given them in April were up.  Actually, the sixty day option period which the Shields had agreed to give in exchange for the $10,000 consideration had expired.  When asked who he talked to on the telephone, he answered, "Jessie".  He did not recall any talk about forfeiting the $10,000.  He then testified that he was not sure if it was Jessie he talked to, remarking that it had been three years since the conversation.  When asked whether he was sure about what was said in the conversation, he answered, "not dead positive, no".  He did recall that the person he talked to, whoever it was, offered to allow him more time.

Paul and Jessie testified they were sure that Lynch had talked to Paul.  Paul offered to extend the option to September 15, a month and a half, and Lynch said that he appreciated that very much and it might do the job.  Shields wanted to be fair and did not want Lynch to have to forfeit his money if there was

a chance of going through with the deal. They had an extension drawn up and after signing it, sent it to Richard Lynch. Lynch admitted receiving it. The document was prepared simply to assure Lynch that he had until September 15 to return the signed Agreement.

The Shields never received a response from Lynch--they did not hear from him again until the law suit was filed--and assumed that the extension was acceptable to him. Defendants were prepared, from the time of the negotiations which took place in April 1970, to comply literally with the terms and conditions set forth in the agreement to sell and were ready, willing and able to convey the property as agreed.

The district court concluded:

"I.

"That as a result of the oral conversations between plaintiff and defendants on April 23rd and 24th, 1970, a written proposal in the form of a purchase agreement was prepared and delivered to plaintiff by mail on or about May 1, 1970, the receipt of which was acknowledged by the plaintiff, which document constituted an offer to sell.

"II.

"That on or about May 29th, 1970, plaintiff, following a meeting with defendants at defendants' ranch in Park County, Montana, addressed a letter to defendants enclosing a check for $10,000.00 as part payment in acceptance of the offer and to obtain an option to hold the deal for him and his associates for a certain period of time, and acknowledged acceptance of the terms of the written contract by assuring defendants that the agreement would be forwarded as soon as power of attorney could be established, by which plaintiff implied that he was acting for himself as well as certain undisclosed associates.

"III.

"That defendants, Paul Shields and Jessie Shields, construed said $10,000.00 payment, together with written assurance by plaintiff that the agreement would be forwarded as soon as power of attorney could be established to sign the agreement, in the nature of an option to hold the deal for the plaintiff until he had perfected his power of attorney.

- 6 -

"IV.

"That the foregoing acts and conduct on the part of plaintiff and defendants, including part payment of $10,000.00, constitute an offer and acceptance, as defined in Section 87A-8-319, R.C.M. 1947, under Subsections (a), (b), and (c) thereof, as well as Section 13-606-4, R.C.M. 1947.

"V.

"That payment of the sum of $10,000.00 constitutes part performance, which removed said transaction from the Statute of Frauds, and placed an obligation upon the defendants in the nature of an option to hold the deal for the plaintiff, and that the defendants did so.

"VI.

"That by reason of the failure of the plaintiff to comply with the agreement in the nature of an option within the agreed time or within a reasonable time, plaintiff forfeited his right to reclaim the consideration paid by him for the option to consummate said purchase within a certain period of time or within a reasonable time."

Referring now to the issues raised. Insofar as the statute of frauds is concerned, under sections 13-606(4), 93-1401-7, 74-203, or 87A-8-319, R.C.M. 1947, it is clear that a fully executed option contract was fully performed and outside the statutes enumerated. Appellant Lynch does not dispute this general statement but argues that the evidence was insufficient to establish the existence of an option agreement.

By our recitation of the facts here and our quotation of the trial court's conclusions, we find there was sufficient evidence to establish the option agreement as well as to show that there was full performance.

The parties had discussed and agreed upon all the essential terms of the sale, most of which were incorporated into the two instruments. The Shields had an offer which they held open for an entire month. On Lynch's visit to the ranch on May 23, 1970, Paul informed him that some payment would be necessary to hold the deal any longer, whereupon the two agreed on

- 7 -

$10,000. Returning to Phoenix, Lynch sent the check and a letter dated May 29, 1970 in which he wrote "We will forward the agreement once we have legally established our (Bud's and mine) power of attorney to sign for the group. I hope our check is sufficient for now." In other words, Lynch was buying and received time. The Shields considered themselves bound and held the property off the market.

These transactions created an option contract as the trial court found. In Peterson Sheep and Cattle Co. v. Moss, 155 Mont. 311, 471 P.2d 546, an option was created by payment of consideration on an agreement to "tie up the property".

Finding substantial evidence to support the findings of the trial court, and finding no merit in the issues raised on appeal, we affirm the judgment.

_Wesley Castles_
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices